# IN THE UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER COOK, an individual, <br><br>                      Plaintiff, <br><br>         v. <br><br> EAGLEPICHER TECHNOLOGIES, LLC, a Delaware corporation; and DOES 1-10; <br><br>                 Defendants. | Case No. <br><br><br> **COMPLAINT** |

## INTRODUCTION

1.      In 2017, Plaintiff Christopher Cook ("Cook") sold his interests in LithiumStart Inc. to EaglePicher Technologies, LLC ("EaglePicher") and was subsequently employed by EaglePicher. While Cook worked diligently and completed multiple milestones for various earn-outs, EaglePicher either delayed making prompt payment to Cook, or in some cases, refused to pay Cook his contractually guaranteed earn-out.

2.      EaglePicher continued to breach its contracts with Cook as it intentionally mismanaged LithiumStart, refused to timely integrate LithiumStart, and intentionally constrained LithiumStart's ability and authority to function and grow. All of this was in violation of the material provisions in the Cook's purchase agreement with EaglePicher.

**3.**     As such, pursuant to the contracts, Cook was entitled to resign, to receive accelerated earn out payments, severance wages, and his bonus. EaglePicher refused and continues to breach the contract it entered into with Cook.

## PARTIES

4.     Plaintiff Christopher Cook ("Cook") is an individual who resides in California. At all times relevant to the Complaint, Cook has resided in California.

5.     Defendant EaglePicher Technologies, LLC is a Delaware corporation which maintains its principal place of business in St. Louis, Missouri. EaglePicher Technologies, LLC employed Cook in its Burlingame, California office.

6.     The true names or capacities, whether individual, corporate, associate, or otherwise of Defendants Does one (1) through ten (10), are unknown to Cook, who therefore sues said Defendants by such fictitious names. Cook will amend this Complaint to allege their true names and capacities when ascertained. Cook is informed and believes and therefore alleges that each of the Defendants designated herein as a fictitious Defendant legally and proximately caused injury and damages to Cook as herein alleged, and is therefore responsible to Cook for the damages and relief requested in this Complaint.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 as Plaintiff is a citizen of California, and Defendant EaglePicher is a citizen of Delaware and Missouri. The amount in controversy exceeds $75,000.

8.     Venue is proper in this Court because the Parties agreed in the Stock Purchase Agreement, the contract at-issue in this matter, that claims should be brought in the United States District Court for the Southern District of New York.

## FACTUAL BACKGROUND

9.      LithiumStart was founded by brothers Christopher Cook and Thomas Cook in 2011. The company designed and built cutting edge lithium ion energy storage solutions for many private and public enterprises, spanning from Fortune 500 companies, to major research universities and government entities, and across many markets. LithiumStart was well situated to bring disruptive new products to market that changed the way people communicate, travel, work, and play.

10.      Richard Schroeder ("Schroeder") joined the company in 2013, and together with the Cooks, LithiumStart experienced tremendous success. LithiumStart was profitable and growing organically, having posted revenue of $3.4 million in 2016, and further growth foreseeable with the demand for lithium ion energy storage solutions growing exponentially. In particular, LithiumStart's proprietary technology, including its agility and ability to perform rapid prototyping, was in hot demand.

11.      Given LithiumStart's success, and its complimentary technology and tools to EaglePicher's own business, EaglePicher sought to acquire LithiumStart in 2017. Ultimately the parties entered into the February 6, 2017 Purchase Agreement ("Purchase Agreement") LithiumStart would become a separate division of the EaglePicher business.

12.      Under the Purchase Agreement, the Cooks and Schroeder (collectively, the "Sellers") received cash consideration at closing, and were entitled to further earn-out payments. However, when Sellers completed milestones to trigger such earn-outs, EaglePicher would drag its feet for months before making the required payment under the Purchase Agreement.

13.      At the same time, EaglePicher and Cook also entered into an employment agreement ("Employment Agreement").

14.     EaglePicher's delay in making payment was part of a pattern of misconduct, a lack of good faith, and indicative of EaglePicher's bad intent. EaglePicher's relationship with its new LithiumStart division turned rocky soon after the acquisition when the post-merger integration was not adequately planned, resourced, or executed. Many key promises made in earlier discussions and planning documents including but not limited to, preserving LithiumStart's autonomy, and investment and growth of the division, were left unfulfilled, and, consequently, LithiumStart's ability to execute was diminished.

15.     By May 2017, Cook, in the midst of EaglePicher's ongoing refusal to invest in and support the LithiumStart division, suspected that Apollo Global Management LLC, EaglePicher's parent company, was preparing to sell EaglePicher—hence the belt tightening, lack of direction, and general chaos.

16.     The sale of EaglePicher to GTCR was proposed in the Fall of 2017. Knowing that EaglePicher could soon no longer be its problem, Apollo Global let the chaos continue.

17.     In August 2017, Kevin Yaremchuk ("Yaremchuk"), a newly hired VP of Aerospace was given substantial oversite of LithiumStart, but he quit within a few weeks. LithiumStart was not consulted in relation to the hiring or oversight of the division, nor was any notice provided to LithiumStart when Yaremchuk left the company with key projects left hanging.

18.     Then George Cintra ("Cintra"), another relatively newly hired VP of Research and Development, was given more oversite and control of LithiumStart, again without consultation or discussion. Cintra quickly eroded LithiumStart's February 6, 2017 Grant of Authority—material consideration the Sellers, like Cook, relied on to be able to complete earn out milestones set forth in the Purchase Agreement.

19.     EaglePicher's mismanagement of LithiumStart continued into 2018. EaglePicher continued to erode LithiumStart's Grant of Authority. Nearly a year after the acquisition, LithiumStart was still only partially integrated on account of the conflicts stemming from EaglePicher's organizational tendency to centralize control due versus the autonomy granted to LithiumStart via the Grant of Authority, and LithiumStart's need to maintain local control and the agility necessary to function and grow.

20.     EaglePicher seemed to purposely frustrate LithiumStart and the Sellers by, *inter alia*, refusing to formalize revenue counting methods, or provide a current account of progress, necessary for the Sellers to determine whether they would be entitled to a revenue earn out under Section 1.05(b)(1) of the Purchase Agreement.

21.     The Sellers sought a dialog with Gordon Walker ("Walker"), EaglePicher's CEO, many times in an attempt to resolve the many issues, but were repeatedly refused or not given actual consideration.

22.     On January 26, 2018, by an email to Walker, Cook provided notice to EaglePicher that there had been a material reduction to his duties and level of authority or responsibility. As an example, Cook noted that all of the LithiumStart engineers reported to Robert Winn ("Winn"), who in turn then started reporting to Cintra; whereas, previously, the engineers and Winn reported to Cook. EaglePicher, specifically Walker, was well aware that the company was violating the grant of authority contained in Cook's employment agreement. This includes, but is not limited to, LithiumStart's inability to purchase raw materials and supplies for key customers, hiring freezes and slowdowns, and unannounced and undiscussed re-organizations. All of these led to significant backlogs in business development and tasks, which ultimately resulted in decreased revenue and lost customers. In essence, EaglePicher was in material breach of the agreements.

23. These "reductions," as defined in the Purchase Agreement, provided Cook a "good reason" to resign from his position should EaglePicher not cure the reductions within 30 days of notice, and should Cook provide a further 30 days' notice of his intent to resign.

24. As EaglePicher did not cure the reduction by February 25, 2018, Cook provided his notice of resignation on March 6, 2018, effective 31 days later on April 6, 2018. In a March 16, 2018 letter, EaglePicher accepted the resignation, effective April 6, 2018, and advised Cook that he no longer was required to come into the office, but had to remain ready to do so upon request of EaglePicher. Cook thereby remained an EaglePicher employee until, and including, April 6, 2018.

### EaglePicher Breaches the Purchase Agreement

25. Pursuant to Section 1.05(d)(i) of the Purchase Agreement, Cook was entitled to an accelerated earn out payment in the event there was an EPT Liquidity Event and Diminution on or before December 31, 2018. As GTCR closed the acquisition of EaglePicher on or about March 8, 2018, EaglePicher cannot contest that there has been an EPT Liquidity Event. As set for the below, there has been a Diminution and Cook is entitled to an immediate delivery of the 2018 Acceleration Payment.

26. "Diminution" is defined, in pertinent part, as a material diminution in duties and responsibilities of such Seller, as compared with such Seller's duties and responsibilities as of immediately prior to an EPT Liquidity Event.

27. It is clear that there was a material diminution of Cook's duties and responsibilities immediately following the EPT Liquidity Event, as compared to his duties prior to the event. Prior to the EPT Liquidity Event, Cook and LithiumStart's authority was delineated in a February 6, 2017 Delegation of Authority. However, that authority was severely limited by the Delegation of Authority distributed on March 9, 2018—the day following the EPT Liquidity Event. Both Amy

Yates and Patrick Funke confirmed that the March 9, 2018 Delegation of Authority superseded LithiumStart's February 6, 2017 Delegation of Authority in a March 13, 2018 email.

28.     Prior to the EPT Liquidity Event, LithiumStart could enter into sales contracts of up to $1 million on its own, but needed the sign off of EaglePicher's CEO after the EPT Liquidity Event. Prior to the EPT Liquidity Event, LithiumStart could enter into purchase orders for supply of product without EaglePicher's signoff, but that was not the case following the Liquidity Event. Similarly, LithiumStart's, and consequently Cook's, ability to enter into NDAs, make P-card purchases, and more, was materially constrained following the EPT Liquidity Event.

29.     Further, as a result of the EPT Liquidity Event, Schroeder's position and reporting obligations were changed, which impacted Cook's responsibilities and authority as previously Schroeder had reported primarily to Cook. Moreover, Cook and LithiumStart staff lost their contractually guaranteed ability to purchase necessary materials and customers, were guaranteed to have the ability to hire, and authority on sourcing and purchasing. In reality, EaglePicher had conducted a designed plan to gradually erode LithiumStart's authority, despite the clear contractual guarantees.

30.     Given that the requirements for an accelerated 2018 earn out payment had been satisfied, Cook gave notice of the acceleration event on March 14, 2018, well within 10 business days of the acceleration event as required by Section 1.05(d)(i). Payment of the 2018 Acceleration Payment was due upon notice.

31.     Cook remained an employee of EaglePicher until April 6, 2018—well after the EPT Liquidity Event, Diminution, and notice of the same. There is not any contractual language that requires Cook to remain an employee for any period of time after the acceleration event to receive the acceleration payment, and nor is there any contractual language that provides an opportunity

to EaglePicher to withhold the acceleration payment should Cook offer his resignation prior to the acceleration event. There is no requirement that Cook provide any opportunity to cure as a result of a Diminution.

### EaglePicher Breaches the Employment Agreement

32.     Cook's Employment Agreement provides that in the event of a Resignation for Good Reason, pursuant to Section 5(b), he is entitled to nine months of severance pursuant to Section 5(b)(i). The severance includes a base salary component, health care coverage, and a bonus for the entirety of the nine-month severance period. As set forth above, Cook has Good Reason to resign, given the reduction, notice of the same, and the appropriate notice of resignation. While EaglePicher contends that there was not Good Reason for the resignation, it is clear that argument is without merit, as set forth above.

33.     Further, given that EaglePicher failed to provide Cook's wages within seventy-two hours of his resignation, EaglePicher is also liable to thirty days of Cook's wages as waiting time penalties. Cal. Lab. Code § 203.

### CAUSE OF ACTION
### Breach of Contract
### (Against All Defendants)

34.     Cook incorporates every allegation contained in each and every one of the above paragraphs, as though set forth fully herein.

35.     Cook entered into a valid agreement, the Purchase Agreement, with Defendants for the sale of Lithiumstart Inc. to EaglePicher Technologies, LLC.

36.     Cook performed all obligations required of it under the Purchase Agreement that were not excused or waived by Defendants' conduct.

37. Defendants breached the Purchase Agreement by failing to pay Cook his accelerated earn out payment due to the EPT Liquidity Event and Diminution which occurred before December 30, 2018.

38. Defendants furthered breached the Purchase Agreement by eroding LithiumStart's authority, despite the clear contractual guarantees.

39. As a result of the breach, Cook suffered damages in excess of $75,000, in an amount to be proven at trial.

40. Cook also entered into a valid agreement, the Employment Agreement, with Defendants.

41. Cook performed all obligations required of it under the agreement that were not excused or waived by Defendants' conduct.

42. Defendants breached the Employment Agreement by failing to pay Cook his contractually guaranteed severance agreement for nine months, a bonus for the entirety of the nine-month period, and health care coverage.

43. As a result of the breach, Cook suffered damages in excess of $75,000.

44. Cook also requests that he be awarded pre-judgment interest, costs, and attorneys' fees.

**Failure to Pay Wages Upon Resignation**
**(Against All Defendants)**

45. Cook incorporates every allegation contained in each and every one of the above paragraphs, as though set forth fully herein.

46. Cal. Labor Code § 202(a) provides that, when an employee resigns or quits their employment, the employer is obligated to pay that employee any outstanding wages owed to them within 72 hours.

47. Cook's resignation was effective on April 6, 2018. As such, he was entitled to be paid his unpaid wages 72 hours after his resignation. Specifically, he was entitled to his 2018 acceleration payment, nine months of severance wages, and his 2017 annual bonus.

48. Defendants failed to remit Cook's full wages within 72 hours of his resignation, and to date have failed to remit Cook's full wages. As such, Defendants are liable for waiting time penalties in the amount of $25,057.

## PRAYER FOR RELIEF

Wherefore, Cook prays for judgment against Defendants as follows:

1. For all damages legally and/or proximately caused to Cook by Defendants;

2. For statutory prejudgment and post-judgment interest on each sum outstanding;

3. For attorneys' fees and costs of suit incurred herein; and

4. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: March 4, 2022

DHILLON LAW GROUP INC.

By: _/s/ Harmeet K. Dhillon_
Harmeet K. Dhillon, Esq.
(NY Registration no. 2667350)
Nitoj P. Singh, Esq.*
Michael R. Fleming, Esq.*
177 Post Street – Suite 700
San Francisco, CA 94108
harmeet@dhillonlaw.com
Telephone: 415.433.1700
Facsimile: 415.520.6593

*Attorneys for Plaintiff Christopher Cook*

*Motion for Admission Pro Hac Vice* forthcoming